DREW, Justice.
The parties to this appeal were divorced in St. Louis County, Missouri, April 23, 1947, in a proceeding instituted by the wife. The final decree in that causé, entered pursuant to a stipulation of the parties, contained the following provision with reference to the four minor children born as a result of said marriage:
“ * * * that said plaintiff have the care, custody, and control of the four minor children born of the marriage of the parties,’ towit, Daphne, Richard, Diane and Whipple; provided the defendant, at his election shall have the care, custody and physical possession b‘f all said children during the summer vacation of each alternate year, be- ■ ginning in 1947, such care and custody during said summer vacation to begin not later than one week after the latest closing date of the school attended by any of said four children, and to terminate not later than one week prior to the earliest opening date of school attended by any of said four children, and also at his election have the care, custody and physical possession of all said children each alternate Christmas vacation, beginning in 1948, for a period of time beginning with the latest closing date of the school attended by any of said four children and terminating not later than the earliest opening date of the school attended by any of said children; with the further understanding that during the period of care and custody of' either of the parties, the other party shall have the right to visit any or all said children at reasonable times and for reasonable periods of time, and with the provision that each parent during the period or periods of custody shall assume and bear all expenses of the children during their respective custody periods, excepting only that the ■ transportation charges shall be borne equally by the parties, and with the 1 right in either party while entitled to the custody and physical possession of said minor children, to take said children outside of the state of Missouri and outside the United States, so long as such action does not deprive the other parent of having the custody' and visitation of said children as hereinabove provided.” (Emphasis added.)
Mary , Sue Oakes, the wife, plaintiff in the lower court and-..appellee here (hereafter called the wife), remarried on June 14, 1947. Whipple V. N. Jones, the husband (hereafter referred to .as the husband), remarried in May, 1950.
At the time the divorce was granted and at all .times since then (except for short periods) the child Daphne has been in an institution, for mentally retarded children. This, according to the testimony, was necessitated by an injury to the brain either, at birth or while quite young. The record shows that, although Daphne has now reached her majority, she has the mentality of a ten year old child and that there is little, if any, likelihood of any improvement in her condition.
The children were in the custody of the father in the West in the summers of 1947, 1949 and 1951 and during the designated Christmas holidays until the Christmas of *254 1952. In November of 1952 the wife, in the meantime having become domiciled in Dade County, Florida, filed in the Circuit Court there her complaint against the husband, seeking a modification of the final decree with reference to the youngest child, Whipple V. N. Jones, Jr., (hereafter -called “Boochie”) to obtain his full time custody. She also prayed for a money judgment against the husband for “such sums as may be found to be the amount expended by the plaintiff herein for the care, maintenance and education of the daughter Daphne Jones for the period as herein alleged, and in addition thereto the cost for education, support and maintenance- of the son Richard during the time he was attending private school or college and away from the physical custody of the plaintiff; and in addition thereto, the cost for education, support and maintenance of the daughter Diane during the time she was attending a private school or college and away from the physical-custody of the plaintiff herein; * * *»
The basis for the custody relief sought by the wife was that during the previous summers when the children were in the husband’s custody, the husband had poisoned the mind of the older boy Richard against her and’ that she feared ¡he would now poison the mind of the younger son if allowed custody during the summer months. Allegations were further made that the climate at the husband’s residence was bad for the health of the child.
In the complaint the wife also alleged in substance that the husband under the terms of the Missouri decree would be entitled to the custody of the child Boochie during the Christmas vacation of 1952 and the summer vacation of 1953 and that he would attempt to take such custody the effecting of which would be detrimental to the child. And in this connection at the application of the wife on December 5, 1952, the court entered a temporary injunction which forbade the husband from “taking or attempting to take into.custody” the minor child, Boochie, until further order of the court.
The husband answered and filed a counterclaim to enlarge for himself the provisions of the Missouri decree as to custody of Boochie.
The lower court, after hearing about 500 pages of testimony taken either before it or by depositions, awarded the sole custody of said minor child to the wife, with only “reasonable visitorial privileges” to the husband although the record shows that the husband 'resides in - Aspen, Colorado, some 2,500 miles from Miami. With reference to the prayer for a money decree for the maintenance of the child Daphne (as to the other children such claim was abandoned) the lower court said:
“The decree being void of any provision relative to the support and maintenance of the institutionalized child, except when in the custody of the plaintiff or the defendant, and the child in question not being in the custody of either, in the opinion of the Court it became the legal duty of the father to render such support and maintenance and to -provide for the special schooling and since he did not and since the mother had made such expenditures, she, the plaintiff, is entitled legally to be reimbursed, however, in this particular case, since the mother is worth millions of dollars and her wealth is many times that of the father, it seems only, equitable to the Court that the claim made by the plaintiff for reimbursement, be denied.”
The husband has appealed from that portion of the decree awarding the sole custody of the child Boochie to the wife and the wife has cross-appealed from that portion of the decree denying a money decree, to her.
We shall dispose of the wife’s appeal first.
The decree of the Missouri Court is conclusive as to all matters properly before the court there that were finally determined in that decree. The only jurisdiction reserved in that decree was to “alter, amend *255 or modify this decree in such form and manner as the Court may from time to time adjudge and determine to meet the needs and best welfare of said children.” Nowhere in the record do we find any allegation or evidence that “the needs and best welfare” of the child Daphne require a modification of this portion of the decree. Moreover, both parties concede that such decree may not be modified retroactively. Pottinger v. Pottinger, 133 Fla. 442, 182 So. 762; Blanton v. Blanton, 154 Fla. 750, 18 So.2d 902.
The wife, however, argues that the decree has never been complied with.by the husband because during the time Daphne was in school she was in the “custody” of neither parent, and therefore the father was liable for the expenses thereof. This contention is completely untenable. The Missouri decree awarded the “custody” of the children and expressly provided that “each parent during the period or periods of custody shall assume and bear all expenses of the children during their respective custody periods.” Daphne was in the custody of her mother at all times except when she was with her father, and under the terms of the decree the burden of the expense of maintenance was on the wife. Moreover, the welfare of the child is not involved at all. The issue is wholly between the parents and both are bound by those terms of the Missouri decree to which they agreed. The decree in that respect is affirmed.
, Haying determined that there was no liability on the part of the husband for the support of Daphne during the period . of her mother’s custody, it is unnecesary to pass upon the unusual findings of the Chancellor that, although the husband was lir able for such support, the fact that the wife was much wealthier than the husband authorized relieving the husband of such liability. . .
’ We now direct our attention to the question of the custody of Boochie.
No useful purpose would be served by a detailed narrative of the voluminous testimony, most of which has no bearing whatever on the issues. The ■ principal contention of the wife is that the husband “poisoned” the mind of the child Richard (nineteen years old at the time he testified in the cause) against her and that she feared he would do the same to Boochie. Most of the record in this case relates to Richard and his association with his father during the .summer vacations. We find nothing whatever in the evidence even faintly tending to prove that the father had “poisoned” the mind of his son Richard against his mother. The testimony of Richard, a highly intelligent and fair young man, establishes beyond .'any doubt whatever that his father did not at any time poison his mind against his mother. Richard’s 'whole attitude toward, his mother is summed up in the following questions and answers:
“Q. Now, in Paragraph 8 on page 4 of the Bill of Complaint filed by Mary Sue Oakes in Dade County, Florida, it • is stated: ÍThat during the most tender years of. their oldest son Richard when defendant (that is, your father) would take the custody and control of said son, as provided in the final decree, he poisoned the mind of said child against your plaintiff so when said child returned to your plaintiff he was an entirely different being and was disrespectful to and of his mother, your plaintiff, and your plaintiff firmly believes and alleges that if defendant, the father, be- permitted to -take the care, custody and control of their younger son, Whipple, as provided in said decree, that he will also attempt to poison the mind of- this child against the mother, y'our plaintiff herein.’ During the summer of 1947 when you were with your father- at Newport Beach, California, do you recall whether or not your father said anything to you about your mother which would poison your mind against your mother? A. No, he never did. Could I explain?
“Q. Yes, you may explain as much as you please. A. When I was out there I had an entirely different life, in that I didn’t have to wear a tie to dinner and didn’t have to get all dressed up, and was living what I *256 thought was the typical American boy’s life and sort of liked it, — and plus that, my mother had gotten married just before this and I was pretty mad because I never expected my mother to ever get married again, — at least I hoped she never would, — and the same with my father, — so when I heard I was supposed to go with father in California, I asked why, and he says, ’Because the Court says so,’ and as soon as- I got out there I started asking questions about what custody meant and why he should have me in the summer and my mother have me during the winters, because I didn’t think that was right, and he told me custody meant he was supposed to have me certain-summers, just the way the divorce trial said, and he never told me very much, and neither did my mother, but I kept getting more curious, and curious and curious, and began to hate my stepfather for marrying my mother because I didn’t think it was right.
“Q. How old were you at that time, in. 1947? .A. I. think I, was just fourteen.”
As to his feelings about his father he said:
“Q. Do you find it hard to explain problems to your father-? A.. I have always been extremely close to my father. ■ I can ask him if I have a problem. One time I hit Georgia’s car against the side of the garage. I realized it was going- to cost money. I left a note — he got up earlier than I did and if he found the paint scratched off and a big dent in it not to go off half cocked because I did it. Later that day he came to me and said, ‘How much do'you think that costs?’ I said, ‘Well, -1 think it will cost $15, $16, rubbed, painted.’ He said, ‘Well, then that will be 15 or 16 hours of hard work,’ and so I worked it off and Georgia didn’t mind; it was fixed up as good as new.”
We are unable to find in the record before, us any substantial credible evidence to support the findings of the Chancellor that the father poisoned the mind of Richard against his mother. But— solely for .the sake of. argument — even if the record, could be interpreted to sustain such finding, it would constitute no legal basis for denying the father partial custody of his young son. . .
There is no contention made here that the father is unfit morally to have the custody of Boochie or that he does not have a good substantial home for him. On the contrary, the record shows him to be a man of character and substance and a good, sensible parent. In the summers of 1947 and 1949 when he had the children with him, the husband had not remarried. Now he is remarried — the record shows, very happily— and maintains a nice summer home in Aspen, Colorado. The record shows that the summer climate there -is not deleterious to Boochie but, on the contrary, is beneficial. There is evidence in the record that it may not be to the best interest of Boochie to send him to Colorado in the winter time. The father commendably recognizes this fa'ct and states in the record that he would be glad to visit him in Florida or have Boochie visit him here during the Christmas holidays. ■
On the record before us it would be a travesty on justice to use the power of the courts of this State to take this young child — now about eleven years old — the flesh and blood of the parent and bearing his father’s name, completely away from his father, who, without question, loves the child devotedly and has been a good and considerate father when he had the child with him. The child needs the companionship and love of his father in a very critical period of • his development and utterly no reason has been established why this relationship should be denied to either, except the unfounded fear on the part of the wife that the husband might poison the mind.of the child against her.
We conclude that no facts have been established that would justify any change in the. Missouri decree, and.that .that portion of the decree of the lower court awarding *257 the sole custody of the child Boochie to the wife must be reversed. We further conclude that the husband was wrongfully deprived of the custody of his child during Christmas of 1952 and the summer of 1953. The lower court is directed to enter a decree awarding the custody of the minor child Boochie to the father for the summer vacations, as defined in the Missouri decree, during the years of 1954 and 1955, and for the Christmas vacations, as defined in the Missouri decree, during the years 1954 and 1955, and thereafter each alternate summer and Christmas as provided in said Missouri decree. If the lower court shall determine that the health of Boochie requires him to spend the winters in Florida, the decree shall restrict the custody with respect thereto.
Reversed in part, affirmed in part.
ROBERTS, C. J., BUFORD, J., and TAYLOR, Associate Justice, concur.